UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___10/20/15___
```

HARVEY H. JAY, M.D.,

               Plaintiff,

      -against-

SPECTRUM BRANDS HOLDINGS, INC.,
SPECTRUM BRANDS, INC., SHASER, INC.,

             Defendants.

13 Civ. 8137 (LTS) (DF)

**MEMORANDUM
AND ORDER**

**DEBRA FREEMAN, United States Magistrate Judge:**

Currently before this Court is a sanctions motion (Dkt. 99) filed by defendants Spectrum

Brands Holdings, Inc., Spectrum Brands, Inc., and Shaser, Inc. (collectively, "Defendants" or

"Spectrum"), alleging that counsel for plaintiff Harvey H. Jay, M.D. ("Plaintiff" or "Dr. Jay"),

violated a protective order (Dkt. 57 (Stipulated Protective Order, dated Oct. 24, 2014 (the

"Protective Order"))) by revealing to Dr. Jay information designated under the Protective Order

as "Highly Confidential – Attorney's Eyes Only" ("AEO"). As relief for counsel's alleged

misconduct, Defendants seek an order: (1) requiring the withdrawal or disqualification of

Plaintiff's counsel; (2) precluding Plaintiff from relying on any of Defendants' non-public

Food and Drug Administration ("FDA") submissions in support of any claim, defense, or

allegation, at any point in this litigation; and (3) requiring Plaintiff to pay the fees and costs of

the sanctions motion. For the reasons set forth below, Defendants' motion is granted to the

extent that it seeks reimbursement for the fees and costs associated with their motion, and it is

denied to the extent that it seeks disqualification of Plaintiff's counsel and preclusion of any use

of Defendants' non-public FDA submissions.

**BACKGROUND**

In this action, Plaintiff claims that Defendants have infringed a number of his patents regarding hair removal techniques that utilize a light-emitting device. (*See* Dkt. 89 (Memorandum Opinion and Order, dated May 12, 2015), at 1.) On October 24, 2014, the Court entered the Protective Order after it was negotiated and stipulated to by the parties. (*See* Protective Order.) The Protective Order states that material may be designated as AEO if disclosure of that information would create a substantial risk of harm to the producing party's commercial interests, and prohibits disclosure of that information to anyone but the Court, outside counsel of record and their staff, court reporters and videographers, outside experts and vendors who agree to be bound by the Protective Order, and certain witnesses. (*Id.* ¶¶ 4-7.) Disclosure of AEO material to Dr. Jay or the in-house representatives of Spectrum is specifically proscribed. (*Id.* ¶¶ 6-7.) The Protective Order also prohibits counsel from "directly or indirectly, transfer[ing], disclos[ing], or communicat[ing] in any way" the contents of AEO material. (*Id.* ¶ 10.) If a party believes that any material produced as AEO does not fall within the scope of that designation, the party may challenge the designation, but it must continue to treat the material as AEO until the producing party withdraws the designation or the Court rules that the material is not entitled to the designation. (*Id.* ¶ 17.) Information designated as AEO is not protected, notwithstanding its designation, if it was independently obtained by the requesting party before it was disclosed in this litigation, is public knowledge, or was disclosed to a third party without restrictions. (*Id.* ¶ 18.)

During discovery, Defendants produced several clinical studies of their products, including studies that Defendants had submitted to the FDA in the course of their efforts to obtain clearance to sell their products. (*See* Memorandum of Law in Support of Spectrum's

Motion for Sanctions for Breach of the Protective Order, filed July 24, 2015 ("Def. Mem.")

(Dkt. 100), at 2.) Defendants designated this material as AEO. (*Id.*)

During the course of conducting Dr. Jay's deposition on June 9, 2015, Defendants

elicited testimony that led them to believe that Dr. Jay had been given access to one or more of

the studies that Defendants had produced with the AEO designation. The testimony by Dr. Jay

that gave rise to this concern began as follows:

> Q:   [In a hair-removal study conducted by Dr. Christine
>       Dierickx,] [s]ome of the hair grew back after it was treated,
>       correct?
>
> A:   They claim that there was a 76.7 percent reduction in the
>       hairs. It depends how they counted the hairs. If they
>       counted the hairs the way Spectrum or Shaser did in their –
>       in one of their studies, they would have counted only the
>       anagen hairs, not the telogen hairs.[1]
>
>       So you're telling me – I haven't read this article in
>       detail now. So the question is which hairs grew back and
>       how did they count them. Did they count them like Shaser
>       did or Remington or Spectrum did, by shaving a week
>       before and then waiting to see what grew back a week later,
>       and only counting the anagen hairs[?] . . . .

(Declaration of Wayne L. Stoner, Esq., in Support of Spectrum's Motion for Sanctions for

Breach of the Protective Order, dated July 24, 2015 ("Stoner Decl.") (Dkt. 101), Ex. C (excerpts

from transcript of Plaintiff's deposition, dated June 9, 2015 ("Jay Dep.")), at 33-34.)

Then, later in the same deposition, Dr. Jay testified:

> Q:   Do you know of any specific hair treated by a Spectrum
>       device that ever grew back or would have grown back but
>       for further treatment?

---

[1] "Anagen" refers to the "active phase of the hair growth cycle," http://www.merriam-webster.com/medical/anagen (last visited Oct. 19, 2015), and "telogen" refers to the "resting phase of the hair growth cycle, http://www.merriam-webster.com/medical/telogen (last visited Oct. 19, 2015).

A:    Yes.

Q:    What?

A:    Okay. Did you see the data from the Spectrum studies that they submitted to the FDA? Did you see that they had –

Q.    No.

A.    This is significant to your question. Did you see that [Spectrum] counted anagen hairs one year later, and they had a 72 percent reduction in anagen hair count[?] Right? They had 27 percent anagen hairs in that area. The normal in that area, on the arms and legs, is 20 to 30 percent.

Q:    So they didn't grow back?

A:    No. They didn't do anything. Because they're only counting anagen hairs. You have – if you look at the tables, if you look at the studies, areas that they treated, at 30 percent anagen hairs. Right? At the end of their study period, they had – they had a 70 percent reduction in the total hair count. So they had only the anagen hairs left. That indicates to me that there's a very good chance, unless the study as presented is not clear, that they didn't do anything for reducing hairs in one year. And as far as I'm concerned, I need . . . clear data from Spectrum to show me that they are reducing hairs at all.

. . .

Q:    Do you know of any use of the commercial Spectrum device where hair was removed and it grew back or would have grown back but for further treatments?

A:    I need to get the data from Spectrum. . . .

Q:    So you don't have the data and you don't know?

A:    I have the data from Spectrum. That is something that they did provide us. So I don't have the complete data, but that's an indication to me . . . .

(*Id.*, at 191-93.)

Believing that this testimony showed that Dr. Jay had accessed highly confidential material, Defendants' counsel emailed Plaintiff's counsel to inquire how Dr. Jay had learned of information contained in Spectrum's clinical studies and whether Dr. Jay had accessed AEO material. (Stoner Decl., Ex. D.) One of Plaintiff's attorneys, James J. Rodgers, Esq. ("Rodgers"), responded that, during the course of preparing Dr. Jay to be deposed, counsel had reviewed the "claimed results" of Defendants' studies, which had been disclosed in promotional materials and in publicly available summaries published by the FDA. (*Id.*, Ex. E.) Rodgers' response further stated:

> In the course of our discussions, we had available copies of [AEO material] and described to [Dr. Jay] some aspects of the protocol for the study. To our knowledge, Dr. Jay has not had access to any other Highly Confidential [AEO] material or information derived therefrom.

(*Id.*) Then, in a second email, Rodgers elaborated:

> [T]he only information discussed with Dr. Jay that related to the clinical trial protocol was information bearing on how the publicly claimed hair reduction numbers were derived, with an emphasis on how hairs were counted . . . . It was information that we needed to address with Dr. Jay in order to enable him to fully understand [Defendants'] hair reduction claims and thus for us to effectively represent him in this matter. Furthermore, there exist only a finite number of known hair-enumeration techniques; discussion of which of those known techniques was used in [Defendants'] methods did not reveal to Dr. Jay any technical information which was not already in the public domain.

(*Id.*, Ex. F.)

On July 24, 2015, Defendants moved for sanctions against Plaintiff (Dkt. 99, 100), alleging that, based on the above, Plaintiff's counsel had deliberately shown and described AEO material to their client for the purpose of giving Plaintiff an advantage in responding to deposition questioning. Defendants contend that Plaintiff's attorneys not only violated the

5

Protective Order, but have demonstrated that they have no intention of honoring that Order in the future, or of respecting the sensitivity of AEO material produced by Defendants. For these reasons, Defendants seek the forced withdrawal of Plaintiff's counsel from this case, as well as preclusive and monetary sanctions. (Def. Mem., at 4-5.)

In his reply to the motion, Plaintiff disputes Defendants' characterization of the relevant facts and states that the motion for sanctions is a "litigation tactic predicated upon mischaracterizations of Dr. Jay's deposition testimony, and of subsequent communications between counsel." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Sanctions, dated Aug. 10, 2015 ("Pl. Mem.") (filed under seal), at 2.) First, Plaintiff contends that Defendants misrepresent the content of Dr. Jay's testimony, stating that "[a]t no point during his deposition did Dr. Jay testify that he saw Defendants' clinical studies." (*Id.*, at 5.) Indeed, Plaintiff maintains that Dr. Jay's testimony revealed just the opposite – that he never saw the complete clinical study data. (*Id.*, at 6.) Plaintiff states that, when Dr. Jay "testified that he had seen *data from* clinical studies by Defendants," he was referring to the publicly disclosed results. (*Id.*, at 5 (emphasis in original).) Second, Plaintiff asserts that Defendants mischaracterize the communications between counsel that took place subsequent to the alleged disclosure of AEO material. Plaintiff states that Rodgers made no reference to Plaintiff "seeing" any AEO material, and that the "only potentially confidential information derived from a document submitted by Shaser to the FDA that may have been communicated by counsel to Dr. Jay related to the procedure that Shaser used for counting hairs in the clinical study." (*Id.*, at 7.)

Plaintiff submits declarations from Dr. Jay (Declaration of Harvey H. Jay in Opposition to Defendants' Motion for Sanctions, dated Aug. 10, 2015 ("Jay Decl.") (filed under seal)) and from another of Plaintiff's attorneys, Gary D. Colby, Esq. (Declaration of Gary D. Colby, Esq.,

in Opposition to Defendants' Motion for Sanctions, dated Aug. 10, 2015 ("Colby Decl.") (filed

under seal)), which lay out Plaintiff's version of the events surrounding the allegedly improper

disclosure.  In his own declaration, Dr. Jay states that he has been engaged in research and

practice in the field of dermatology for over 40 years, and that he is therefore familiar with the

research and literature on light-utilizing hair removal techniques.  (Jay Decl. ¶¶ 3-4.)  As such,

Dr. Jay states that, when he learned from publicly available documents that Defendants' clinical

studies counted only actively growing – *i.e.*, anagen – hairs, he knew that Defendants must have

used a technique to distinguish actively growing hairs from non-growing hairs.  (*Id.* ¶¶ 7, 14, 16.)

As, according to Dr. Jay, the "shaving-and-counting" method is one of the simplest and by far

the most common technique for counting anagen hairs, he claims that he deduced that

Defendants had utilized this method in the clinical studies they submitted to the FDA.  (*Id.* ¶ 17

("[T]here would be no sensible reason to employ a more difficult, costly, or complicated hair-

counting technique.").)  Dr. Jay further claims to have "presumed that the time interval between

shaving and hair-counting employed in Shaser's clinical stud[ies] would be on the order of about

one week, since that would be the most sensible and convenient interval for counting growing

hairs at the body locations reportedly studied by Shaser."  (*Id.* ¶ 18.)  With respect to the

disclosure at issue in this motion for sanctions, Dr. Jay states that he "explained to [his] counsel

[his] understanding of the hair-counting method that Shaser had employed in its clinical

stud[ies,] and a response by [his] counsel caused [him] to believe that [his] presumption (that the

time interval was about one week) was accurate."  (*Id* ¶ 19.)

    Colby's attorney declaration is consistent with Dr. Jay's account.  In his declaration,

Colby states that, during the course of preparing for the deposition, Dr. Jay explained to his

attorneys "his thoughts regarding how the study 'must have been performed,' including his

understanding [of] how growing hairs were counted." (Colby Decl. ¶ 11.)  At some point, Colby

says that he stopped the discussion to consult an AEO clinical study protocol document, "in

order to ascertain whether Dr. Jay's understanding of how the study 'must have been'

conducted . . . was in reasonable accordance with how the study had actually been performed."

(Id. ¶ 12.)  Colby states that, after consulting this AEO document, he indicated to Dr. Jay that

"[Dr. Jay's] understanding of how the study was conducted sufficiently comported with the

description in [the] clinical study protocol document for the purposes of [their] discussion." (Id.

¶ 13.)  Colby states that it was not his intention to communicate to Dr. Jay any confidential

information, and that he did not believe at that time that any confidential information had been

communicated.  (Id. ¶ 14.)  Buttressing the statements made by Dr. Jay in his own declaration,

Colby also states that, afterwards, Dr. Jay explained that he had taken Colby's indication to mean

that Dr. Jay's presumption as to how Defendant's study "must have been performed" – that

Defendants had counted anagen hairs by shaving the skin and counting re-grown hairs about a

week later – was correct.  (Id. ¶ 19.)  Colby states that he does not specifically recall disclosing

that the time interval used in Defendants' studies was one week.  (Id. ¶ 20.)

    Plaintiff contends that, to the extent that counsel did disclose the method that Defendants

used to count hairs, the communication did not violate the Protective Order because this

information was publicly disclosed and thus not required to be treated as AEO.  (Pl. Mem.,

at 6-9.)  In support of this contention, Plaintiff asserts that the fact that Defendants' clinical

studies counted only anagen hairs appeared in publicly available materials and was readily

ascertainable by individuals in the profession of dermatology.  (Id., at 7-8.)  Plaintiff further

argues that, to the extent any violation of the Protective Order did occur, the breach was trivial and not committed in bad faith. (*Id.*, at 10-11.)[2]

On reply, Defendants argue that Plaintiff's explanation of what happened is contradicted both by Dr. Jay's deposition testimony and the earlier communications between counsel. (Reply Memorandum in Support of Defendants' Motion for Sanctions ("Def. Reply") (filed under seal), at 2-4.) Defendants further suggest that the only plausible explanation for how Dr. Jay was able to testify about specific information disclosed only in Spectrum's clinical studies is that he actually viewed the AEO clinical study documents. (*See id.*, at 3-4.)

### DISCUSSION

## I.   APPLICABLE LEGAL STANDARDS

Rule 37 of the Federal Rules of Civil Procedure provides that "[i]f a party . . . fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders." Fed. R. Civ. P. 37(b)(2)(A). By logical extension, this Court has consistently held that a protective order issued under Rule 26(c) can be enforced through Rule 37(b). *See, e.g., Schiller v. City of New York*, No. 04 Civ. 7921, 2007 WL 1623108, at *3 (S.D.N.Y. June 5, 2007) ("Discovery orders that can be enforced through Rule 37(b) include protective orders issued under Federal Rule of Civil Procedure 26(c)."); *Flaherty v. Filardi*, No. 03 Civ. 2167 (LTS), 2009 WL 3762305, at *5 (S.D.N.Y. Nov. 10, 2009) (same).

Rule 37 provides for a range of permissible sanctions, one of which is the preclusive sanction Defendants seek here – *i.e.*, a sanction "prohibiting the disobedient party . . . from

---

[2]   Plaintiff also alleges that Defendants have abused the AEO designation by indiscriminately applying it to nonconfidential material (*id.*, at 11-14), although this is not relevant to the issue of whether Plaintiffs' counsel violated the Protective Order.

introducing designated matters in evidence." Fed. R. Civ. P. 37(b)(2)(A)(ii), (vii).  Sanctions

under Rule 37 are intended:  (1) to ensure that a party will not benefit from its failure to comply

with a court order, (2) to obtain the party's compliance, and (3) to serve as a deterrent.  *See*

*Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988) (citing *Nat'l Hockey*

*League v. Metro. Hockey Club, Inc.*, 427 U.S. 639 (1976)).  With these purposes in mind,

"Rule 37 permits the imposition of 'just' sanctions," and thus "the severity of [the] sanction must

be commensurate with the non-compliance." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490

F.3d 130, 140 (2d Cir. 2007).

        "Severe sanctions are justified . . . when the failure to comply with a court order is due to

willfulness or bad faith, or is otherwise culpable," *Daval Steel Prods. v. M/V Fakredine*, 951

F.2d 1357, 1367 (2d Cir. 1991), but the Court's discretion in selecting an appropriate sanction

should be guided by a number of factors, including:  "(1) the willfulness of the noncompliant

party or the reasons for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of

the period of noncompliance; and (4) whether the noncompliant party had been warned of the

consequences of his noncompliance," *Nieves v. City of New York*, 208 F.R.D. 531, 535

(S.D.N.Y. 2002) (citing *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 852-54 (2d Cir.

1995)); *see also Jobe O. v. Pataki*, No. 03 Civ. 8331 (RCC) (KNF), 2007 WL 844707, at *4

(S.D.N.Y. Mar. 15, 2007) ("[W]hile willfulness and bad faith may justify the imposition of a

sanction(s), the express language of the Rule makes clear that they are not prerequisites to

imposing a sanction(s) under Fed. R. Civ. P. 37(d).  Rather, they are factors to be considered by a

court in determining what sanction(s), if any, to impose on a party that has not met its discovery obligations.").[3]

Although a court may, in its discretion, hold a hearing on a sanctions motion brought under Rule 37, *see In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897 (HB) (DF), 2011 WL 2581755, at *3 (S.D.N.Y. Apr. 29, 2011), *report and recommendation adopted* No. 05 Civ. 1897 (HB), 2011 WL 2471267 (S.D.N.Y. June 21, 2011), it is appropriate to refrain from holding such a hearing where a thorough written record has been presented and the respective positions of the parties are clear, *see SJ Berwin & Co. v. Evergreen Entm't Grp., Inc.*, No. 92 Civ. 6209 (WK), 1994 WL 501753, at *1 (S.D.N.Y. Sept. 14, 1994); *Monaghan v. SZS 33 Associates, L.P.*, 148 F.R.D. 500, 510 (S.D.N.Y. 1993).  Only where the court imposes sanctions that require a finding of willfulness is an evidentiary hearing required.  *See Monaghan*, 148 F.R.D. at 510 (citing *Flaks v. Koegel*, 504 F.2d 702 (2d Cir. 1974)).

## II.    DEFENDANTS' MOTION FOR SANCTIONS

In this case, while the parties dispute certain facts, this Court finds that a hearing is not necessary, as Defendants' motion is capable of resolution based on the parties' written

---

[3] Aside from Rule 37, the Court also has inherent authority to sanction a party for its failure to comply with a protective order.  *See Schiller*, 2007 WL 1623108, at *3.  In particular, under its inherent authority, the Court may impose contempt sanctions for a violation of its order, "if (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (internal quotations and citations omitted).  "[C]ivil contempt sanction[s] may . . . serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance," *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989), but may not be purely punitive, *Manhattan Indus, Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 6 (2d Cir. 1989).

submissions, and as, for the reasons discussed below, this Court is not imposing any sanction that requires a finding of willful misconduct.

A.    **Whether Defendants Have Demonstrated
       Non-Compliance With the Protective Order**

As Defendants are seeking sanctions, they have the initial burden of demonstrating Plaintiff's noncompliance. *See Markey v. Lapolla Indus., Inc.*, No. 12-CV-4622 (JS) (AKT), 2015 WL 5027522, at *16 (E.D.N.Y. Aug. 25, 2015) (noting that, in the context of a motion for Rule 37 sanctions based on noncompliance with an order compelling discovery, the party seeking sanctions has initial burden to demonstrate violation has occurred); *Oleg Cassini, Inc. v. Electrolux Home Products, Inc.*, No. 11 Civ. 1237 (LGS) (JCF), 2013 WL 3056805, at *3 (S.D.N.Y. June 19, 2013) (same). In the context presented here, Defendants can only satisfy this burden by demonstrating that information they produced in this action with an AEO designation (1) was not otherwise publicly available (Protective Order ¶ 18), and (2) was actually disclosed to Dr. Jay by his counsel (*id.* ¶¶ 6-7).

1.    **Alleged Non-Public Nature of the AEO Information**

Defendants contend that Dr. Jay must have seen (or was at least informed by counsel of the content of) AEO-designated data and tables contained in Defendants' clinical studies. (Def. Reply, at 3-4.) In particular, Defendants assert that Dr. Jay, at his deposition, showed his familiarity with those data and tables by testifying to the following pieces of information, contained in AEO material:

        (a)    that Defendants' studies counted only anagen, and
                  not telogen, hairs;

        (b)    that Defendants counted anagen hairs using a
                  shaving-and-counting method;

        (c)    that the interval of time Defendants used between
                  shaving and counting hairs was one week;

(d)    that Defendants counted anagen hairs one year after treatment;

(e)    that the studies showed a 72 percent reduction in anagen hair count, leaving 27 percent anagen hairs in the treated area; and

(f)    that, at the end of the study period, Defendants recorded a 70 percent average reduction in total hair count.

(*Id.*, at 6-7 (citing Jay Dep., at 33-34, 191-93).)

Arguing that all of the information at issue was publicly available, Plaintiffs have submitted certain public summaries of Defendants' data with their opposition papers. (Colby Decl., Exs. A, B, C.) Defendants, however, with reference to the above items, contend that Dr. Jay "testified to numerous and specific aspects of Spectrum's clinical protocols and data, none of which is stated in the [publicly available summaries] appended to [Plaintiff's] opposition." (Def. Reply, at 6.)

Upon comparing Dr. Jay's deposition testimony and the information contained in the public documents provided by Plaintiff, this Court has little doubt that an experienced dermatologist – certainly one who had knowledge of the literature regarding hair removal, and who had himself worked on developing a light-utilizing hair-removal device – would have been able to determine from public documents the information listed at (a) and (d) above, *i.e.*, that Defendants' studies counted only anagen hairs, and that Defendants counted anagen hairs one year after treatment. (*See* Colby Decl., Ex. A (public document stating: "[Spectrum's device is] intended for Permanent Reduction in unwanted Hair. Permanent hair reduction is defined as the long-term stable reduction in the number of hairs growing when measured at 6, 9, and 12 months after the completion of a treatment regimen"); Ex. C (public document stating: "[The Spectrum

13

device is] intended for permanent reduction in unwanted hair. Permanent hair reduction is defined as the long-term stable reduction in the number of hairs re-growing when measured at 6, 9, and 12 months after the completion of a treatment regimen. . . . Hair counts were taken . . . 12 months following the final treatment."); *see also* n.1, *supra*.)

The submitted public documents do *not* reveal, however, the information identified at (b) and (c) above, *i.e.*, that Defendants used a shaving-and-counting method, with an interval of one week between shaving and counting, to measure the results of their studies. Based on this, and on Plaintiff's admission that counsel referred to AEO material when confirming Dr. Jay's understanding that Defendants must have used this method (*see* Colby Decl. ¶ 12-13), this Court can only conclude that this particular information was contained in AEO documents, and was non-public.

The percentages of anagen hair count (item (e), above) and of reduction in total hair count (item (f), above) to which Dr. Jay testified (Jay Dep., at 191-92) also do not appear in any of the publicly available documents that Plaintiff has provided to the Court. Defendants, however, have not shown that the likely source of the information was AEO documents, as they have not placed before the Court any AEO documents that *do* contain the percentages in question, and Plaintiff's counsel has not admitted to sharing any such AEO information with Dr. Jay. (*See generally* Colby Decl.) The Court therefore cannot rule out the possibility that Dr. Jay obtained this data elsewhere, or that he misremembered or rounded figures that appeared on the public summaries that Plaintiff has provided. (*Compare* Jay Dep., at 192 (testifying that, "at the end of [Defendants'] study period, they had . . . a 70 percent reduction in the total hair count") *with* Colby Decl., Ex. C (publicly available summary noting results at three, six, and 12 months, and stating that results of study at 12 months showed 66% average hair reduction at test sites).)

Moreover, the Court has been given no reason to believe that any percentage hair-reduction results that appear in the AEO clinical study documents differ from those made available in public summaries of the FDA studies; certainly, Defendants have not demonstrated any such discrepancy. Under these circumstances, the Court cannot conclude that Dr. Jay based his testimony regarding the percentage results of Defendants' study on non-public, AEO documents produced in this action by Defendants. Rather, on the ambiguous record presented, this Court finds that Defendants have not met their burden of demonstrating that Dr. Jay must have obtained this particular data from non-public AEO clinical study protocols.

For these reasons, the Court is not satisfied that Defendants have shown that all of the information at issue, to which Dr. Jay testified, was non-public, but the Court is persuaded that, at least certain of that information – namely the fact that Defendants used a shaving-and-counting method to count hairs, and that they employed this method at one-week intervals – was not publicly available.

### 2.  Claimed Disclosure by Plaintiff's Counsel

As to the question of whether Plaintiff's counsel improperly disclosed the non-public AEO information to Dr. Jay, this Court first notes that Defendants have offered nothing but speculation to support their contention that Dr. Jay must have been *shown* tables or other AEO material by his counsel. (*See* Def. Mem., at 2 (asserting that Plaintiff's counsel "deliberately show[ed] and described materials designated [AEO] to Plaintiff Jay to prepare him for his deposition"); Def. Reply at 7 (asserting that "[Dr.] Jay was intentionally and improperly shown" AEO documents).) Certainly, Dr. Jay did not testify to viewing AEO materials directly,[4] and

---

[4] To the contrary, Dr. Jay's answers to questions posed at his deposition suggest that he had not seen the complete set of data underlying the studies' results. (Stoner Decl., Ex. D, at 192-93.) ("I need clear data from Spectrum to show me that they are reducing hairs at all. . . .

nothing about the particular confidential information at issue makes it self-evident that it could only have been learned by him through seeing it with his own eyes.  Moreover, both Dr. Jay and his counsel have now submitted declarations made under penalty of perjury, stating that no AEO material was shown to him.  (*See generally* Jay Decl.; *see also* Second Declaration of Harvey H. Jay in Opposition to Defendants' Motion for Sanctions, dated Aug. 28, 2015 ("Second Jay Decl.") (Dkt. 112); Colby Decl.)

The Protective Order, however, does not distinguish between conduct by counsel in showing confidential material to a person who is not permitted to see it, and informing that person orally (or even through a knowing nod of the head) about the contents of the material. Any method of disclosure is equally impermissible under the Order.  (*See* Protective Order ¶ 10 (prohibiting counsel from "directly or indirectly, transfer[ring], disclos[ing], or communicat[ing] *in any way*" the contents of that AEO material to an individual not authorized to receive it (emphasis added)).)  Accordingly, to demonstrate a violation of the Protective Order, Defendants need only show that counsel conveyed non-public AEO information to Plaintiff, regardless of how such conveyance was made.

Here, the Court is satisfied that, at a minimum, Plaintiff's counsel improperly informed Dr. Jay of the shaving-and-counting methodology employed by Defendants.  Regardless of whether Dr. Jay may have guessed that this was Defendants' protocol, both Plaintiff and his attorney concede that, at the very least, counsel confirmed the information to Dr. Jay from a review of AEO material.  (*See* Jay Decl. ¶ 19 (Dr. Jay stating that his attorney confirmed his

---

I need to get the data from Spectrum. . . .  So I don't have the complete data . . .); (*id.*, at 195) ("I [am not] privy to studies on Spectrum users.").

assumptions as to how Defendants' study must have been performed); Colby Decl. ¶ 13 (attorney

stating that he "indicated to Dr. Jay . . . that his understanding of how the study was conducted

sufficiently comported with the description in [the] clinical study protocol document").)  While

Colby states, in his declaration, that "[i]t was not [his] intention to communicate to Dr. Jay any

confidential information contained in the clinical study protocol document, and [he] did not

believe at the time that [he] had communicated any confidential information to him" (Colby

Decl. ¶ 14), nothing in the Protective Order suggests that it would have been permissible for

counsel to confirm Dr. Jay's beliefs as to what was contained in confidential AEO materials.

Thus, even if this Court were to credit Colby's recitation as to what occurred here, the Court

could not accept that no impermissible disclosure was made.

Accordingly, this Court finds that Defendants have satisfied their burden of

demonstrating that Plaintiff's counsel violated the Protective Order.

## B.   **Appropriateness of Particular Sanctions**

Having found that the actions of Plaintiff's counsel violated the Protective Order, the

Court turns to the question of whether sanctions are warranted for the violation and, if so, to

what degree.  Defendants request that the Court issue an order:  (1) disqualifying Plaintiff's

counsel; (2) precluding Plaintiff from relying on any of Defendants non-public FDA submissions

in support of any allegation, claim, or defense in this action; and (3) requiring Plaintiff to pay the

fees and costs incurred by Defendants in connection with their sanctions motion.  (Def. Mem., at

4-5.)  For the reasons discussed below, this Court denies Defendants' requests for

disqualification and preclusive sanctions, but grants Defendants' request that Plaintiff be

required to pay the attorneys' fees and costs associated with the motion.

1.    **Disqualification and Preclusion**

The disqualification of an attorney is "a serious sanction that ought not to be imposed

lightly." *Bowens v. Atl. Maint. Corp.*, 546 F. Supp. 2d 55, 86 (E.D.N.Y. 2008) (citing

*Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989)).  Imposition of this sanction impinges on

a party's right to the counsel of his choice, and motions seeking disqualification "are often

interposed for tactical purposes." *Song v. Dreamtouch, Inc.*, No. 01 Civ. 0386 (AGS), 2001 WL

487413, at \*4 (S.D.N.Y. May 8, 2001); *see also Tylena M. v. Heartshare Human Servs.*, No. 02

Civ. 8401 (VM) (THK), 2004 WL 1252945, at \*2 (S.D.N.Y. June 7, 2004) (quoting *Bd. of Educ.*

*of the City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)).  For these reasons,

disqualification of an attorney is "generally disfavored," and courts examine motions seeking

such a sanction with "fairly strict scrutiny." *Bowens*, 546 F. Supp. 2d at 86 (quoting *Lamborn*,

873 F.2d at 531).  "The Second Circuit has made clear that disqualification is appropriate only if

there is a significant risk that an attorney's conduct will taint the trial, such as where his

unethical conduct will prejudice his adversary." *Song*, 2001 WL 487413, at \*4.

The preclusion of evidence is also "a harsh remedy, 'justified . . . when the failure to

comply with a court order is due to willfulness or bad faith, or is otherwise culpable.'" *Hart v.*

*Westchester Cnty. Dep't of Soc. Servs.*, 160 F. Supp. 2d 570, 579 (S.D.N.Y. 2001) (quoting

*Daval Steel Prods.*, 951 F.2d at 1365).  Furthermore, before imposing a preclusion sanction, a

court "should inquire more fully into the actual difficulties which the violation causes, and must

consider less drastic responses." *Ritchie Risk-Linked Strategies Trading, Ltd. v. Coventry First*

*LLC*, 280 F.R.D. 147, 157 (S.D.N.Y. 2012) (quoting *Outley v. New York,* 837 F.2d 587, 591 (2d

Cir. 1988)).  This sanction is therefore appropriate only in "rare situations" evincing culpable

conduct by the party against whom sanctions are imposed. *See Gurvey v. Cowan, Liebowitz &*

18

*Latman, P.C.*, No. 06 Civ. 1202 (LGS) (HBP), 2013 WL 3718071, at *13 (S.D.N.Y. July 15, 2013).

In this case, this Court is troubled by the seemingly cavalier attitude towards the Protective Order that was evinced by Plaintiff's attorney in counsel's initial email exchange about the improper disclosure. When Defendants' counsel first inquired as to what AEO material Dr. Jay had accessed, Rodgers responded that counsel had "described to [Dr. Jay] some aspects of the protocol for the study." (Stoner Decl., Ex. E.) In his follow-up email, Rodgers then stated that the hair-counting method used by Defendants "was information that [counsel] *needed to address* with Dr. Jay in order to enable him to fully understand Shaser's hair reduction claims." (*Id.*, Ex. F (emphasis added).) This suggests that Plaintiff's counsel felt that they were justified in ignoring AEO designations and the dictates of the Protective Order, where they had unilaterally decided that disclosure was necessary.

Nonetheless, the totality of the circumstances presented here do not justify the imposition of sanctions as severe as those requested by Defendants. For one thing, this Court cannot find, on the record presented, that the impermissible disclosure was as substantial as Defendants make it out to have been. In fact, based on the evidence presented, this Court cannot conclude that the violation consisted of more than a single incident, in which Plaintiff's counsel disclosed only limited information.

Further, Defendants have not shown that they have suffered any commercial harm as a result of the violation. Defendants assert that "there was and is harm" because "[Dr.] Jay is a potential competitor of Spectrum." (Def. Reply at 8.) In making this argument, however, Defendants appear to rely on their unsupported contention that Dr. Jay actually saw the complete, underlying study data; they do not identify any commercial harm that resulted from

Dr. Jay's learning only that Spectrum had used a shaving-and-counting method with a time interval of one week. In considering this issue, the Court notes that there would seem to be a significant difference between a disclosure of commercially sensitive, technical information about how to *develop* a light-utilizing hair removal device and a disclosure revealing only that a commonly-used technique was used to measure the effectiveness of such a device. Indeed, the Protective Order was particularly crafted to protect against the disclosure of "highly sensitive and confidential information relating to . . . commercial products or planned commercial products, or confidential and highly sensitive technical, financial and research information," such as "highly sensitive information relating to the development of products . . . or materials that relate to proprietary information." (Dkt. 57, Section 4.) While much of the information contained in the clinical study documents presumably meets this description, the definition seems to suggest that information concerning which of the finite number of available hair-counting methods was used to measure the study results may not be the type of information that the AEO designation was designed to protect.

Defendants also fail to identify any way in which disclosure of AEO material to Dr. Jay has prejudiced them in the litigation of this case. While Defendants argue that Plaintiff's counsel intentionally breached the Protective Order "because they desired to give Dr. Jay an advantage in responding to deposition inquiries" (Def. Mem. at 3), they do not explain how knowledge of the particular information apparently learned by Dr. Jay actually resulted in a litigation advantage for Plaintiff. The Court therefore has no basis to conclude that the improper conduct engaged in by Plaintiff's counsel has resulted in any actual prejudice to Defendants, either commercially or in the context of this action.

In addition, Defendants have not shown that, absent disqualification of Plaintiff's counsel, future proceedings in this action would necessarily be tainted, or that no lesser sanction than preclusion of evidence would be effective at deterring future violations of the Protective Order. Especially given the narrow parameters of the violation that has been demonstrated by Defendants, this Court cannot find that a lesser sanction, such as requiring Plaintiff's counsel to pay Defendants' fees and costs for their motion, would be insufficient to address the situation presented and deter future misconduct.

Thus, regardless of whether Plaintiff's counsel intentionally disregarded the terms of the Protective Order, this Court finds that Defendants have not satisfied their burden of demonstrating that either of the two severe sanctions they seek should be imposed. *See Markey*, 2015 WL 5027522, at *16.

### 2. Reimbursement of Fees and Costs Incurred on the Motion

The "mildest" sanction specifically enumerated under Rule 37(b) is an order that the party who violated the discovery order at issue, or the attorney advising that party, be required to reimburse the opposing party for expenses caused by the violation. *See Oleg Cassini, Inc.,* 2013 WL 3056805, at *3 (quoting *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979)). Rule 37(b) generally requires that this sanction be imposed on a party who fails to comply, "unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C); *see also Novak v. Wolpoff & Abramson LLP*, 536 F.3d 175, 178 (2d Cir. 2008) (noting that the language of Rule 37 "certainly suggests that an award of expenses is mandatory unless one of the two exceptions – substantial justification or other circumstances -- applies"). Once it is shown that a

21

discovery order was violated, the disobedient party has the burden of showing that an award of the expenses caused by the violation is not warranted. *See Novak*, 536 F.3d at 178.

Plaintiff argues that even this mild sanction should not be imposed because of the supposedly trivial nature of the disclosure. (Pl. Mem., at 10-11.)  Plaintiff also suggests that Defendant has overly (and in bad faith) designated its produced documents, seeking to protect information that cannot legitimately be characterized as confidential or commercially sensitive. (*Id.*, at 11-14.)  Even accepting, however, that the disclosure by Plaintiff's counsel was of relatively minor information, and even assuming that the disclosure was made indirectly (rather than by showing Dr. Jay any documents), this would not have justified the violation.  Similarly, the question of whether Defendant may have over-designated AEO information is beside the point.  Indeed, Plaintiff acknowledges as much, stating "that Defendants' bad faith use of the AEO designation cannot justify or excuse a violation of the Protective Order by Plaintiff."  (*Id.*, at 14.)  In fact, if Plaintiff's counsel believed that Dr. Jay needed to know certain aspects of the clinical protocols that did not involve highly sensitive technical information, then counsel could – and should – have requested de-designation of that information through the procedure explicitly set out in the Protective Order.

Overall, this Court finds no circumstances here that would make an award of expenses unjust, *see* Fed R. Civ. P. 37(b)(2)(C), and the Court therefore directs Plaintiff's counsel to pay to Defendants the reasonable expenses, including attorneys' fees, caused by the violation – specifically, the fees and costs incurred by Defendants in making their motion for sanctions.

## CONCLUSION

For the reasons stated above, Defendants' motion (Dkt. 99) is granted to the extent that it seeks reimbursement of all reasonable expenses, including attorneys' fees, incurred by

Defendants in connection with their sanctions motion, and is otherwise denied.  Defendants'

counsel is directed to provide Plaintiff's counsel, within one week of the date of this Order, with

a breakdown of the relevant fees and costs.  If, after good-faith conference, the parties cannot

agree as to whether the fees and costs sought are reasonable, they may return to this Court for

resolution of that issue.

Dated:  New York, New York
       October 20, 2015

                          SO ORDERED

                          DEBRA FREEMAN
                          United States Magistrate Judge

Copies to:

All counsel (via ECF)

23